Filed 6/26/13  P. v. Honma CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B239033 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA064672) |
| v. | |
| STEVEN RONALD HONMA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Thomas Rubinson, Judge.  Affirmed.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Lawrence M. Daniels, Supervising Deputy Attorney General, and Allison H. Chung, Deputy Attorney General, for Plaintiff and Respondent.

————————————

Defendant Steven Ronald Honma appeals his conviction of one count of voluntary manslaughter (Pen. Code, § 192, subd. (a))[1] with a true finding that he personally used a firearm causing death (§§ 12022.53, subds. (b)–(d), 12022.5, subd. (a)).  Defendant contends the trial court's hasty and flawed conduct of the voir dire deprived him of a fair trial because the trial court's goal was to salvage problematic jurors rather than remove jurors for actual bias.  In particular, defendant argues he is entitled to reversal and a new trial because (1) the trial court's hurried voir dire did not permit sufficient time to question jurors to elicit bias; (2) a biased juror sat on his case; (3) the trial court refused to excuse jurors for cause, thus requiring defendant to use peremptory challenges; and (4) the trial court's harsh questioning of jurors in front of other jurors affected the responses of other jurors, and the trial court erroneously believed jurors would answer honestly about biases.  We affirm.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

**A.      Factual Background**

On March 20, 2010, Sherri Hafizi hosted a party at her home to celebrate the Persian New Year.  Defendant and his wife Christine resided two houses down the street from Hafizi and arrived at the party around 7:00 p.m. to 7:30 p.m.  The victim Norman Schureman was married to Sherri Hafizi's daughter Farah.

At the party, defendant was acting belligerently, cursing in the kitchen, and was escorted out of the party.  Defendant went home, and when he returned, he had changed his clothes and was wearing a blue jacket.  Defendant sat down by a fire pit in the back yard and pulled out a knife and started flicking it.  Sherri Hafizi's nephew Ali Hafizi was sitting next to defendant and asked defendant, "Why are you doing this?"  Defendant responded that, "If I were you, I would not be talking to me right now."  Ali Hafizi grabbed defendant's right hand, and Mohammed Hafizi, Ali Hafizi's uncle, came over and grabbed defendant's left hand.  Someone took the knife and defendant began to struggle.  The three men fell to the ground.  Mohammed Hafizi noticed defendant had a

---

[1] All statutory references herein are to the Penal Code unless otherwise noted.

2

gun and took it out of defendant's pocket. Ali Hafizi lost his grip on defendant's wrist. The victim Schureman ran up and jumped on defendant, and said, "I got shot." Ali Hafizi saw that defendant had a gun in his hand, and took the gun from defendant.

Ghazaleh Fahim heard the shot and went into the patio. She observed defendant on the ground acting violently. Defendant was being held down by several people. She jumped on defendant, flipped him over and restrained him until sheriff's deputies arrived. Mohammed Hafizi had hit defendant in the face and defendant's face was swollen.

Defendant suffered a fractured nose and eye socket and was hospitalized for several days. He did not remember that anyone had been shot. Sheriff's deputies recovered two weapons from the Hafizi residence—a gray semiautomatic .45 with a mounted scope and a black nine-millimeter gun. They also found six ammunition magazines. The weapons were registered to defendant and his wife.

After being transported to the hospital, Schureman died of a gunshot wound to the abdomen.

The jury found defendant guilty of the lesser included offense of voluntary manslaughter, and found true the allegation that defendant personally used a firearm. The court imposed an aggregate sentence of 21 years, consisting of the upper term of 11 years and the upper term of 10 years on the gun use allegation.

## B.    Procedural History

On October 27, 2011, the prosecution filed a first amended information charging defendant with murder (§ 187, subd. (a)). The information further alleged appellant personally used and discharged a firearm causing death. (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a), & 12022.53, subds. (b)–(d).)

Trial commenced on October 26, 2011 and was estimated to take three weeks. Prior to voir dire, counsel and the trial court prepared a jury questionnaire. With respect to bias, defense counsel asserted that it was difficult for jurors to admit bias, and thus it was more revealing to ask whether a prospective juror had a positive bias in favor of

3

persons of Persian or Japanese ancestry.[2]  The trial court disagreed, stating, "I'm not sure that I agree with you that people are always going to be reluctant to admit biases," but agreed to include questions on positive bias.

On October 27, 2011, a pool of 62 jurors was brought in.  The trial court told the jury that under the new one-day, one-trial jury service, the courts needed "a lot more jurors coming into our system.  [¶]  The result of that is the court has to be extremely cautious in excusing jurors for inappropriate reasons or for reasons that are not permitted by law because, like I said, once you're excused from this case, we've lost you probably for an entire year or more."  The court stated it would not excuse a juror simply because a juror would lose income while performing jury duty.  Instead, the court told jurors they would be excused only if there would be "extreme financial hardship which I have to tell you is a very difficult standard to reach."

The jury pool was given a questionnaire to answer and return on Monday, October 31, 2011.  On Monday October 31, 2011, the court advised that any jurors claiming a hardship should stay in the hallway.  The court questioned and excused 11 jurors for hardship.

### 1.    First Group of Jurors

The court advised counsel they would have 30 minutes each to examine the jurors during voir dire.  Before jury selection began in open court, the trial court made introductory remarks concerning basic legal principles.  The trial court explained the presumption of innocence, the prosecution's burden of proving its case beyond a reasonable doubt, assessing the credibility of witnesses, and admonished the jury that it could only consider evidence produced at trial.

---

[2] Defendant is of Japanese descent, the underlying crime occurred during a Persian New Year party and several potential witnesses were of Persian descent.  The questionnaire asked, "Do you have any sympathies for, or prejudices against, Persian people that might prevent you from judging Persian witnesses fairly" and another question asked, "Do you have any sympathies for, or prejudices against, Japanese-Americans that might prevent you from judging a Japanese-American defendant fairly?"

4

Juror No. 1.[3]  Juror No. 1's questionnaire disclosed that her sister had been assaulted by a neighbor, held at knifepoint, and threatened with rape; she escaped from her attacker but refused to testify at trial concerning the incident.  During voir dire, defense counsel questioned her about her sister's victimization.  Juror No. 1 stated, "Well, after listening to what the judge had to say, I understand you have to kind of just bottle it up and set it aside and start fresh, so I certainly would attempt to do that." Defense counsel asked whether or not Juror No. 1 "might feel [some] sort of sympathy or empathy on behalf of the death of Mr. Schureman [and would that] color your assessment of the facts in the case," to which Juror No. 1 responded, "I will make every effort not to have it influence me."  In addition, Juror No. 1's mother required round-the-clock care, and Juror No. 1 had only been able to arrange for several days of care.  After that, Juror No. 1 would have to pay $180 per day for care, yet she was currently unemployed and was looking for work.

Defense counsel challenged Juror No. 1 for cause, but his challenge was denied. The court did not find the Juror's financial hardship was sufficient to justify excusing her. Defense counsel excused Juror No. 1 with a peremptory challenge.

Juror No. 3.  Juror No. 3's questionnaire stated that she had "some high school" and she wrote "do not understand" in response to several of the questions.  At voir dire, she informed the court she had difficulty with the English language.  She told the court she did "not really" understand English because she did not finish grade school.  She had been in the United States eight years, and worked as a nursing assistant.  The court inquired how she communicated with patients, nurses and doctors, and Juror No. 3 stated, "Mostly I [do] not communicate with the doctor because I'm only a nursing assistant." The court observed that Juror No. 3 understood what the court had been saying, but Juror No. 3 responded that she did "not really" understand.  Defense counsel asked her if she understood all of the questions on the questionnaire.  She said, "No sir.  That's why I

---

[3] We discuss in detail those jurors who were the subject of in-depth discussion in defendant's opening brief.

didn't answer [them]." The prosecution asked Juror No. 3 about her understanding of English, and she responded, "not all of your question[s] I understand" and that "I'm sure that I cannot—I cannot do [jury duty]."

The prosecution challenged Juror No. 3, and defense counsel concurred. The trial court found that Juror No. 3's command of English was "[f]ine. Every question that was asked by the court or counsel she answered. She was responsive, she was appropriate, and her language skills are sufficient." The prosecution exercised a peremptory challenge, and the trial court excused Juror No. 3.

Juror No. 6. Juror No. 6's questionnaire stated that he could not set aside what he had read and heard about the case, and that he would be suspicious of a defendant who did not testify or call witnesses. Juror No. 6 informed the court that he may have had contact with the victim, who designed eyewear, at a trade show. In addition, Juror No. 6 was the director of a charitable foundation that had considered making a donation to the school where the victim taught, Art School of Design in Pasadena. The juror informed the court that he believed his knowledge of the victim would bias him "because [of] the kind of person [the victim] was, and . . . I just feel that it was something that he didn't deserve to happen to him." The court responded, "I don't think anybody would disagree with that. The question in th[is] case, though, isn't whether he deserved this to happen to him. The question in the case is, number one, was a crime committed, and, number two, did [defendant] commit it and can the People prove that beyond a reasonable doubt? And, you know, the fact that you might have had, you know, some contact with the decedent really doesn't bear on any of those questions, does it?" Juror No. 6 responded, "Well, in my mind it does." The juror could not assure the court he would not let his acquaintance with the victim sway his view of the case. Defense counsel asked Juror No. 6 if he had heard about the shooting when it occurred, and the juror responded he had heard about the memorial. He elaborated that, "I would like the scales of justice to be even, and because of what I've experienced, my bias would be leaning one way versus the other" and this would give the prosecution "a leg up" in his view. The prosecution

6

inquired whether he felt he was as capable as the next person of controlling his emotion, pity, sympathy, passion, prejudice in order to serve as a juror. Juror No. 6 said, "I don't think so." Juror No. 6 stated that he could not serve fairly.

The defense moved to excuse Juror No. 6 for cause. The court excused Juror No. 6.

Juror No. 27. Juror No. 27's questionnaire stated that he was a television writer and that his birth mother had been murdered; as a result, he questioned his ability to be impartial. Prior to the commencement of voir dire, Juror No. 27 told the court he was a television writer and if he did not report for work he would be replaced. He also told the court he did not believe he could be impartial. During voir dire, the trial court asked Juror No. 27 about the effect his birth mother's murder would have on his ability to serve as a trial juror in this case. Juror No. 27 replied that over the weekend he had thought about the case and stated, "I think [the court] made the point that murder is never necessarily a good thing, so I think separating those two is something obviously that I would be able to do in hearing the facts of the case; that they aren't related." Juror No. 27 stated that he thought he could be fair. Juror No. 27 told defense counsel the same thing during defense counsel's questioning. Juror No. 27 stated, "I think that I'll be able to separate feelings about that based on the circumstances of the case and the evidence. I don't think that would cloud one way or the other."

Defense counsel challenged Juror No. 27 for cause based upon the juror's shift in assessment of his ability to be impartial, which defense counsel described as "180 degrees." The trial court denied the defense challenge, noting that Juror No. 27's "change of heart" about serving as a juror occurred because his job was not in jeopardy and he reconsidered the effect of his birth mother's death. The trial court refused to speculate that Juror No. 27's desire to serve as a juror in this case was based on his desire to write about the case. The defense exercised a peremptory challenge against Juror No. 27.

Juror No. 31.  Juror No. 31's questionnaire did not indicate she had any bias against Persians.  However, during voir dire, Juror No. 31 told the court she had a bias against Persians and believed she could not be fair because of it.  Although she would not disbelieve everything a Persian witness had to say, she would have to hear all of the facts.  The court asked Juror No. 31 that if she were wearing a blindfold and a Persian witness testified, and Juror No. 31 believed the testimony, would she change her mind after the blindfold was taken off.  Juror No. 31 said she would not, but if the testimony fit with other facts, she would believe it.

Defense counsel challenged Juror No. 31 for cause because she had specifically stated she had bias.  Defense counsel argued that, "[t]his juror states specifically that [she has] bias.  This is the young woman who sat over in this corner.  You asked her whether she herself has any bias, and she admitted to having bias in the case; that she would excuse herself because of Persian witnesses.  She has a hard time believing them.  'I wouldn't want to have myself on the jury.'  She even asked to speak privately about this."

Regarding the trial court's further questioning of Juror No. 31, defense counsel stated: "And, your honor, I sense your frustration during the course of sitting with these jurors when they articulate their inability to be fair, and that's a fair reaction.  [¶]  On the other hand, the point of this process to get them out and to get them being candid with their responses.  If your honor is going to be expressing shock and outrage and incredulity when someone says that they feel bias about a witness, it's going to shut everybody up. Nobody is going to talk about their biases or their concerns.  They're going to be in fear of being browbeaten and giving the wrong answer.  [¶]  So, I mean, it's just very hard to get people to talk in public, and here this woman was talking in public about different issues, prejudicial issues. . . .  [¶] . . . My point was I thought that you had a juror who was making every attempt to be candid, and when they are confronted with sort of shock and outrage over that, then nobody is willing to articulate their biases or prejudices."

8

The trial court responded: "I don't agree with that. First of all, it wasn't shock and outrage that I thought I was demonstrating. What I was doing—it's very easy for a juror who doesn't want to sit on a case to say, 'I'm biased.' What I was doing was breaking that down and examining with that juror whether or not they really can honestly state in response to a hypothetical situation how they believe they would respond and how they would act and whether they would actually be biased as opposed to just saying they would be biased. That's all I was doing. That was my intent, anyway."

Defense counsel continued, "[w]ell, they're being asked to reflect on their own personal assessment, and to the extent we don't accept that, to the extent that that's rejected, it just sends a—nobody wants to articulate for either side their prejudices." The trial court remarked, "I didn't notice a reticence on the part of this [venire] to express biases on a number of different issues. I didn't get the feeling that people were afraid to bring that up at all. We spent most of the morning on those types of issues."

Later, during voir dire of the second panel, Juror No. 31, who was in the jury box, spoke up and said she had a crazy neighbor who "tries to fight everybody on our block." The neighbor had threatened her and her brother with a machete. She also told the jury that her brother was in jail for armed robbery and had been shot at before. Juror No. 31 requested to sit in the back of the jury box. Defense counsel did not have any additional peremptory challenges and his request for additional challenges was denied. Juror No. 31 served on the jury.

Defense counsel used all of his 30 minutes to question 15 of the 50 prospective jurors (Nos. 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, 19, 22, 27, & 30). The prosecution used 28 minutes to question 12 prospective jurors (Nos. 1, 3, 6, 7, 8, 10, 14, 15, 21, 31, 40 & 56). During defense counsel's challenges, the trial court stated, "I don't want you to go through the whole questionnaire, [defense counsel]. We have 62 jurors here to deal with. Come on. I've read all the questionnaires and heard all the questioning. The challenges for cause, I want you to make a full and complete record, but you don't have to go over

9

each response that a juror made. I read them and heard them. I spent a lot of time on them myself this weekend."

The trial court continued, "[When I asked] '[a]re there any of the prospective jurors who don't understand my explanation about these principles of law?' nobody raised their hand. Or maybe there was one person, who I then followed up with. 'Is there anybody who would have any difficulty in applying these principles of law as I just spent five or ten minutes explaining to them?' Nobody raised their hand. . . . [¶] . . . [¶] . . . My inference is that because many jurors raised their hands to many of these questions that were gone over today, if any jurors had a response to my inquiries concerning [any] question . . . that those folks would have raised their hands as well."

Defense counsel stated: "[M]y last point is, your honor, silent jurors in response to your questions don't mean it's an unbiased juror. It can mean a lot of things. Maybe it can mean [the juror is] unbiased, but maybe it means that they still have the biases that they articulated in their paperwork. Maybe they still feel the same way, but they don't want to say it in front of 50 other people. To infer from silence of those broad questions, I submit, respectfully, doesn't establish that they're unbiased in light of their specific written responses."

The trial court expounded: "when a juror indicates something in a written questionnaire and then is questioned on that point by the judge and then is asked specifically by the judge, '[d]o you understand—is there anything about what I've just said that you don't understand' and they don't raise their hand, '[i]s there anything about what I've just said that you don't agree with or couldn't apply' and they don't raise their hand, you're quite right, . . . perhaps they're just afraid to raise their hand or perhaps they're harboring those same feelings despite what the judge told them. [¶] When they don't raise their hand, it is certainly not an unreasonable inference that they now understand something that they didn't understand at the time that they were filling out the questionnaires, and, therefore—you know, otherwise what's the point of doing any verbal

10

follow-up? You would just—whatever they write on the questionnaire is the end of the story, and we could just start with challenges at that point. [¶] But if both counsel and the court can clarify certain issues, make certain points, explain certain principles of law, sometimes people learn things. You're right. Sometimes they don't. Maybe it will be up to you to exercise your judgment on any of those folks that I don't excuse for cause whether or not their failure to raise their hand or what they meant by this or what they meant by that was something that you can believe in or whether it's not and you want to exercise a peremptory. That's what they're for. So that's my general feeling with regards to your last point."

The trial court further stated: "Let me just state, also, as a general matter I do feel, as I started to say before, on the issues of jurors who had some negative reaction to the prospect of the defendant not testifying or the defense not calling witnesses, that the court took pains this morning to go over those very important points with the [jury], and when I asked them whether there was anybody who didn't understand that explanation that I had given—and it was, I think, a fairly lengthy and thorough explanation; maybe I'm wrong about that, but I thought it was—and nobody raised their hand, and then when I asked them if they could apply those important principles of law—or if they would have any difficulty applying them, nobody raised their hand. [¶] So I'm not going to repeat that as to each of the jurors that were challenged here for cause, but I want to incorporate that observation and those comments into my ruling as to each of the jurors for whom [there] that has been an issue raised."

Defendant challenged 24 prospective jurors (Nos. 1, 3, 6, 8, 10, 11, 14, 21, 22, 27, 29, 30, 31, 35, 39, 40, 41, 42, 44, 55, 56, 58, 60, & 61). Defendant exercised nine peremptory challenges against jurors he had challenged for cause but where the trial court denied his challenge: Juror Nos. 1, 27, 29, 35, 41, 44, 55, 58, and 61.

During challenges, defense counsel objected that he had insufficient time to question the jurors, and had averaged 30 seconds for each juror. The court responded, "By my count, between the folks that we lost on Thursday and the for cause challenges

11

that I'm sustaining now, a total of 19 that we've lost, which means we've got 43 jurors remaining. So obviously both sides have the right to exercise 20 peremptories if they'd like, but I'd like you to keep in mind there are no perfect jurors."

### 2. *Second Group of Jurors*

An additional group of jurors was brought in for the second round of voir dire. The court declined to use the questionnaires on the second round. When the second group was brought in, the court informed the jurors that the court had been unable to complete jury selection with the first round of jurors and that was why a second group was called and excused the jurors for the day because it was the end of the day.

The next day, defense counsel moved for a mistrial, arguing that the court's comments implied that defense counsel was the cause of the delay in getting the jury selected. Defense counsel argued that the trial court sent a message to the prospective jurors that defense counsel acted inappropriately during the jury selection process. Defense counsel argued, "We wanted more than the 80 jurors. I didn't believe that 80 jurors was enough. Your honor said, 'That's all we can get,' and I realize that. . . . But, nonetheless, that's the reason for the time crunch now." The trial court responded that the defense would not agree to have the jurors time qualified and said, "don't say the reason that it took longer is because they weren't time qualified when you're the one who prevented them from being time qualified." Defense counsel also argued, "We were forced to exercise our peremptory challenges on jurors that had substantial cause and substantial time problems with their service." The trial court responded, "You felt [the challenges] were substantial. I didn't feel they rose to the level necessary to excuse them for cause under the applicable law." The court denied the motion for mistrial, finding the jury was not informed of the cause of the delay. Defense counsel also moved for five additional peremptory challenges, but the court denied the request.

The trial court told the second panel that it could only excuse jurors for "extreme financial hardship, which is a very difficult standard to reach." The trial court gave the new prospective jurors principles of law and conducted voir dire. After excusal of some

12

jurors, the court gave counsel 10 minutes each to ask questions of 20 remaining jurors. During challenges for cause, the parties were limited to 15 minutes.

Juror No. 68.[4] Juror No. 68 was an "R and D assistant" whose husband was a risk analyst. She had sat on a criminal jury before the same trial judge the previous May. Juror No. 68 sat through that trial and was excused during deliberations due to severe financial hardship. The court asked "How did you get so lucky to get called for jury service again?" Juror 68 responded, "Because you ordered me to come back." Juror 68 claimed to have been shot, and did not believe she could be fair and impartial. While she was on the previous jury, two of her fellow jurors told Juror No. 68 that they did not believe she could be fair and impartial because of her past experience. In response to the court's question whether this would affect her ability to be fair and impartial, she responded, "I just don't want to go through the same thing. It caused a lot of stress" and she did not think she would have a clear head. She did not want to look at the coroner's pictures because it would evoke sympathy from her as a gunshot victim.

The prosecution challenged Juror No. 68 for cause. The defense stipulated to her dismissal, but the court stated, "I'm not going to be excusing her." Trial counsel argued to the court the reasons for cause in dismissing the juror, and stated that she "just sat on a jury six months ago and I thought appeared to be mad that she had to come back here again." The trial court responded, "I agree. That's the main thing, is that she's mad that she has to come back here, and I think some of these excuses that she's made are just those. She's upset that she got called back for jury duty again." The court denied the challenge for cause, stating: "as soon as she walked in the back doors of the courtroom she was thinking of as many reasons as she could to get off of jury service. . . . [¶] She had her hand raised to everything to try to do anything she could to get off of this jury, and I frankly didn't believe a lot of what she was saying." Juror No. 68 was designated as an alternate juror, but no alternate jurors were substituted in at trial.

---

[4] Juror No. 68 was part of the second panel and thus did not answer a jury questionnaire.

13

The parties accepted a panel consisting of Juror Nos. 13, 15, 18, 31, 32, 49, 57, 62, 63, 64, 65, and 66.

## DISCUSSION

Defendant argues he is entitled to reversal and a new trial because (1) the trial court's hurried voir dire did not permit sufficient time to question jurors to elicit bias; (2) a biased juror sat on his case; (3) the trial court refused to excuse jurors for cause, thus requiring defendant to use peremptory challenges; and (4) the trial court's harsh questioning of jurors in front of other jurors affected the responses of other jurors, and the trial court erroneously believed jurors would answer honestly about biases.

A defendant accused of a crime has a constitutional right to trial by an unbiased, impartial jury. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16.) "'Either party may challenge an individual juror for "an actual bias." [Citation.] "Actual bias" in this context is defined as "the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party." [Citations.]'" (*People v. Ayala* (2000) 24 Cal.4th 243, 271–272; see also *People v. Barnwell* (2007) 41 Cal.4th 1038, 1051 ["A juror who is actually biased is unable to perform the duty to fairly deliberate and thus is subject to discharge"].) Voir dire is the tool by which bias is uncovered, and "must be probing enough to reveal jurors' prejudices regarding issues that may arise at trial, so that counsel may exercise their challenges in an informed manner." (*Scott v. Lawrence* (9th Cir. 1994) 36 F.3d 871, 874; *In re Hitchings* (1993) 6 Cal.4th 97, 110.) "While counsel may not use voir dire for the purpose of instructing, educating, cajoling, or prejudicing the jury, he or she may conduct a reasonable oral inquiry of prospective jurors to determine the basis of a challenge for cause." (*People v. Balderas* (1985) 41 Cal.3d 144, 182.)

"No hard-and-fast formula dictates the necessary depth . . . of voir dire." (*Skilling v. United States* (2010) ___ U.S. ___ [130 S.Ct. 2896, 2917, italics omitted].) Trial courts possess broad discretion over both decisions concerning the qualifications of

14

prospective jurors to serve and the manner of conducting voir dire.  (*People v. Martinez* (2009) 47 Cal.4th 399, 445; *People v. Thornton* (2007) 41 Cal.4th 391, 420 ["trial court 'possesse[s] discretion to conduct oral voir dire as necessary and to allow attorney participation and questioning as appropriate'"].)  Indeed, decisions of the United States Supreme Court in this area "have made clear that 'the conduct of voir dire is an art, not a science,' so '"[t]here is no single way to voir dire a juror."'  [Citations.]" (*People v. Cleveland* (2004) 32 Cal.4th 704, 737, italics omitted.)  "'The Constitution . . . does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury.'"  (*Ibid.*, italics omitted, quoting *Morgan v. Illinois* (1992) 504 U.S. 719, 729.)

### A.      Sufficient Time to Conduct Voir Dire

Defendant argues that deference to the trial court's discretion is not warranted where the trial court did not engage in a meaningful exercise of its discretion in the first instance:  Here, the trial court placed unreasonable time limits on voir dire and thus was unable to uncover juror bias.  He also argues the trial court's restrictions on voir dire were so extreme that they were a denial of the right to conduct voir dire, and reversal is automatic.

"The right to voir dire the jury is not constitutional, but a means to achieve the end of an impartial jury.  [Citation.]" (*People v. Ramos* (2004) 34 Cal.4th 494, 512.)  "As long as the essential elements of a jury trial are preserved, including" impartiality, the Legislature may impose reasonable regulations or conditions on the right to a jury trial. (*Id.* at p. 513.)  The court is required to conduct the initial voir dire of prospective jurors in criminal cases.  (Code Civ. Proc., § 223.)  Upon completion of this preliminary examination, "counsel for each party shall have the right to examine, by oral and direct questioning, any or all of the prospective jurors.  The court may, in the exercise of its discretion, limit the oral and direct questioning of prospective jurors by counsel.  The court may specify the maximum amount of time that counsel for each party may question an individual juror, or may specify an aggregate amount of time for each party, which can

15

then be allocated among the prospective jurors by counsel. . . ."  (Code Civ. Proc., § 223.)

We have observed that the adequacy of voir dire is a matter "'"'not easily subject to appellate review.  The trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial.  Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and responses to questions.'"'"  (*People v. Carter* (2005) 36 Cal.4th 1215, 1250.)  The applicable standard is a demanding one:  "'Unless the voir dire by a court is so inadequate that the reviewing court can say that the resulting trial was fundamentally unfair, the manner in which voir dire is conducted is not a basis for reversal.  [Citation.]  A fortiori, the same standard of reversible error applies when both the court and counsel participate in the voir dire.'"  (*Ibid.*)

"[I]t is the duty of the trial judge to restrict the examination of the prospective jurors within reasonable bounds so as to expedite the trial.  [Citations.]"  (*People v. Wright* (1990) 52 Cal.3d 367, 419.)  "The trial court has discretion to limit voir dire, and the court abuses that discretion, warranting reversal of a conviction on appeal, only when its decision falls outside the bounds of reason [citation] resulting in a 'miscarriage of justice.'"  (*People v. Navarette* (2003) 30 Cal.4th 458, 486; see Code Civ. Proc., § 223.)

Here, defendant complains that he was afforded 35 seconds per juror who had answered a questionnaire, and 26 seconds per juror for those who did not answer a questionnaire.  In addition, he complains that in denying many of his challenges for cause, the trial court relied on the lack of responses to general questions to the jury, such as whether the jury could follow certain principles; further, the questions asked during the second panel (the questioning of Juror Nos. 26, 31, and 33)[5] show the inadequacy of the voir dire as a whole.

---

[5] Juror No. 26, an Evangelical Christian, stated that he was against killing under any circumstances, and was excused by the court on its own motion.  Juror No. 33 revealed that a cousin had been raped.

16

We disagree. The trial court employed several efficiencies in prescreening the jury for bias. First, the questionnaire permitted a first look at potential bias that could be used as a basis for further questioning during voir dire. Second, the trial court used the "'struck jury'" method described in *People v. Avila* (2006) 38 Cal.4th 491, 537, where a large panel of prospective jurors is questioned about bias. This method was designed to, and did, further explore issues of bias. Thus, by the time counsel were permitted to question the prospective jurors themselves, the questioning was necessarily more focused and economical. As a result, both methods permitted the trial court to expedite the process of voir dire while at the same time maintaining a platform for a more detailed examination of bias, if warranted. Voir dire here was the "'culmination of a lengthy process.'" (*Skilling v. United States*, *supra*, 130 S.Ct. at p. 2919.) On the other hand, defendant insists he was entitled, at the expense of courtroom resources, to engage in a free ranging questioning of prospective jurors without regard to time limits. We disagree. Counsel were informed at the outset of voir dire of the time allotted for each side; it was thus incumbent upon counsel to budget their questioning accordingly. Given that at least the first jury panel (consisting of 62 prospective jurors) had been prescreened with questionnaires and interviewed by the court before counsel began questioning, we fail to see how defense counsel's claimed inability to question all the necessary jurors was the fault of the court. Rather, the record reflects counsel made tactical decisions concerning those jurors to focus on during voir dire.

**B.     The Record Supports the Trial Court's Determination That a Biased Juror Did Not Sit on the Jury**

Defendant argues that Juror No. 31 admitted she was biased against Persian witnesses, yet was permitted to serve on the jury. Furthermore, Juror No. 31 was the victim of an attack by her neighbor, similar to the attack that occurred in this case. Based on these facts, defendant asserts that we cannot speculate Juror No. 31 was impartial.

17

### 1. Additional Factual Background

Juror No. 14, who was questioned before Juror No. 31, wrote on her questionnaire that, "I've found Persians as a group to be rude and unpleasant," but indicated on her questionnaire that she had no sympathies for or prejudices against Persians. Defense counsel did not question Juror No. 14 during voir dire. In response to the prosecution's query, "is there anything additional that you're thinking that would cause you not to serve fairly as a juror or do you think you would serve fairly?" Juror No. 14 responded, "I don't think I can because I may not be able to believe the witnesses. I've just had very bad experiences with Persians in particular in all my business dealings that I would have to say I think I've just been lied to and cheated so many times that pretty much I would probably have to discount nine out of ten of what they say." After the prosecution asked the other jurors whether they had biases against Persian people, Juror No. 31 stated, "I would excuse me [for bias]" because she did not believe she could be fair to the prosecution if it called Persian witnesses.

In response to the court's question, Juror No. 14 stated that she would not believe anything a Persian witness would say. In response to the same question, Juror No. 31 responded that she would not disbelieve everything a Persian witness said, but would have to hear all of the facts. Nonetheless, she had "a hard time believing them." She did not believe every Persian was a liar. Juror No. 14 stated about Persians, "they always present themselves very wonderfully, very jovial, hospitable, very nice, and always very believable at first. It's only after you've signed a contract that you find out that there was a problem." The trial court granted the challenge against Juror No. 14, stating, "[Juror] No. 14 has a clear bias against Persian people that she's not going to be able to get past." With respect to Juror No. 31, the court remarked, "[Juror] No. 31 is a more difficult call. The main issue with her would be the bias against Persian people. It seemed to me she's a younger juror than was Juror No. 14, who was clearly biased against Persian people and had a lot of life experience that she cited to back up those prejudices. I didn't hear the same thing from [Juror No.] 31. From [Juror No.] 31 I got the feeling that she was

18

piggybacking on [Juror No.] 14. [Juror No.] 31, when she said, 'I would excuse myself,' I think she'd like to do nothing more than excuse herself from this case." The court continued, "I questioned [Juror No. 31] additionally, and I thought she was able to get to the point where she said, 'I will be able to put these preconceived notions aside and base my decision on the evidence.' Like I said, a closer call, but I don't think it rises to the level of a challenge for cause."

### 2. Analysis

"'To find actual bias on the part of an individual juror, the court must find "the existence of a state of mind" with reference to the case or the parties that would prevent the prospective juror "from acting with entire impartiality and without prejudice to the substantial rights of either party."'" (*People v. Horning* (2004) 34 Cal.4th 871, 896.) We examine the context in which the trial court denied the challenge in question to determine whether the court's decision that the prospective juror's beliefs would not substantially impair the performance of his duties fairly is supported by the record. (*People v. Crittenden* (1994) 9 Cal.4th 83, 122.) If "a prospective juror provides conflicting answers to questions concerning his or her impartiality, the trial court's determination as to that person's true state of mind is binding upon the appellate court." (*Ibid*.) Whether to remove a prospective juror for cause rests within the trial court's wide discretion. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1146.)

We find no abuse of discretion in the court's decision to deny the challenge for cause to Juror No. 31. The record demonstrates the court engaged in extensive discussion and question-and-answer with Juror Nos. 14 and 31, both of whom professed to have biases against Persians. The record supports the trial court's conclusion that Juror No. 31's bias would not interfere with her ability to deliberate: the trial court believed Juror No. 31 was following the lead of Juror No. 14 and attempting to get out of jury service; Juror No. 31's opinion was not, like Juror No. 14, based upon any hard facts, but instead on vague notions of untrustworthiness; and Juror No. 31 stated she would need to "hear all the facts" before actually making up her mind about the

19

credibility of the testimony of a Persian witness. On this basis, we find the trial court's conclusion Juror No. 31 did not harbor actual bias supported by the record (*People v. Horning*, *supra*, 34 Cal.4th at p. 896) and thus we do not find the trial court abused its discretion in refusing to excuse Juror No. 31, and defer to the trial court's conclusions regarding Juror No. 31. (*People v. Whalen* (2013) 56 Cal.4th 1, 31 [trial court's findings as to impartiality and credibility of prospective jurors "will not be disturbed on appeal unless it renders the trial fundamentally unfair"].)

### C. Refusal to Excuse Jurors for Cause

Defendant also argues that the trial court failed to excuse jurors for cause and required him to use his peremptory challenges, and the court refused to concede jurors should be excused and attempted to salvage them. In particular, defendant complains the trial court refused to excuse Juror No. 68 although she was trying to avoid jury duty. In doing so, the trial court failed to identify and remove a juror whose state of mind would prevent her from acting impartially.

"To preserve a claim based on the trial court's overruling a defense challenge for cause, a defendant must show (1) he [or she] used an available peremptory challenge to remove the juror in question; (2) he [or she] exhausted all of his [or her] peremptory challenges or can justify the failure to do so; and (3) he [or she] expressed dissatisfaction with the jury ultimately selected." (*People v. Maury* (2003) 30 Cal.4th 342, 379.) "To prevail on [appeal], defendant must demonstrate that the court's rulings affected his right to a fair and impartial jury." (*People v. Yeoman* (2003) 31 Cal.4th 93, 114.)

With respect to the prospective jurors a defendant contends should have been dismissed for cause, those individuals could not have possibly affected the jury's fairness where they did not sit on the jury. (See *People v. Yeoman*, *supra*, 31 Cal.4th at p. 114.) As explained in *Yeoman*: "[t]he harm to defendant, if any, was in being required to use four peremptory challenges to cure what he perceived as the trial court's error. Yet peremptory challenges are given to defendants subject to the requirement that they be used for this purpose. [Citation.] While defendant's compliance with this requirement

20

undoubtedly contributed to the exhaustion of his peremptory challenges, from this alone it does not follow that reversible error occurred. An erroneous ruling that forces a defendant to use a peremptory challenge, and thus leaves him unable to exclude a juror who actually sits on his case, provides grounds for reversal only if the defendant '*can actually show that his right to an impartial jury was affected . . . .*' [Citation.] In other words, the loss of a peremptory challenge in this manner '"provides grounds for reversal only if the defendant exhausts all peremptory challenges and *an incompetent juror is forced upon him.*"'" (*Yeoman*, at p. 114.)[6] Here, as discussed above, substantial evidence supports the trial court's finding that Juror No. 31, the juror who sat on the jury, did not harbor actual bias. As a result, we conclude the exhaustion of his peremptory challenges did not constitute prejudicial error.

"Finally, ""[d]espite its importance, the adequacy of voir dire is not easily subject to appellate review. The trial judge's function at this point in the trial is not unlike that of jurors later in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions."""" (*People v. Whalen*, *supra*, 56 Cal.4th at p. 30, italics omitted.) For these reasons, the court's manner of conducting voir dire will not be disturbed on appeal unless it renders the trial fundamentally unfair. (*People v. Carter* (2005) 36 Cal.4th 1215, 1250.)

With respect to Juror No. 68, that juror was, in the court's view, answering questions in a manner to permit her to evade jury duty and was angry and frustrated at having to appear, but did not exhibit any bias. For that reason, the court declined to grant

---

[6] As defendant points out, the Supreme Court granted review in *People v. Black*, review granted January 30, 2013, S206928, to address the standard of prejudice and designated the issue on review as: "Should a conviction be reversed because of the erroneous denial of challenges for cause to prospective jurors when the defendant exhausts his peremptory challenges by removing the jurors, seeks to remove another prospective juror who could not be removed for cause, and is denied additional peremptory challenges, or must the defendant also show that an incompetent or biased juror sat on the jury?" *People v. Black* asserted that in *People v. Yeoman*, *supra*, 31 Cal.4th 93, the court apparently articulated a new standard of prejudice in conflict with *People v. Bittaker* (1989) 48 Cal.3d 1046.

a challenge for cause and seated Juror No. 68 as an alternate juror. We defer to the trial court's findings on credibility and demeanor. In any event, defendant has failed to demonstrate any prejudice from the selection of Juror No. 68 because she did not participate in deliberations. In addition, as discussed above, because defendant has failed to demonstrate Juror No. 31 harbored actual bias, any loss of a peremptory challenge to excuse that juror did not result in an unfair trial.

Finally, to the extent defendant complains of the court's treatment of jurors who were dismissed (such as Juror Nos. 3, 6, 27, & 68) in order to censure the court's conduct of voir dire as a whole and establish prejudice, his attempt fails. The court's probing questions did not amount to an attempt to salvage problematic jurors; rather, it was an attempt to uncover those jurors who were attempting to evade jury service, such as Juror No. 68, or did not have the disability they claimed to have, such as Juror No. 3.

### D. Questioning of Jurors in Front of Other Jurors

When jurors expressed doubts about being able to be impartial, defendant complains that the trial court "took them on" in the presence of other prospective jurors, and this conduct educated the other jurors how to avoid engaging in a debate with the trial court and thwarted a probing inquiry into juror bias. Defendant contends the trial court "embarked on jury selection with the erroneous belief that jurors would not be reluctant to admit their biases."

Group voir dire is a reasonable and acceptable procedure, even in capital cases. (See, e.g., *People v. Carter* (2005) 36 Cal.4th 1215, 1249.) As discussed above, in this case the trial court utilized the "'struck jury'" method of jury selection: A large initial panel of prospective jurors was seated in the courtroom and questioned for bias or other factors that might exclude them for cause. (See *People v. Avila*, *supra*, 38 Cal.4th at p. 537.) However, "[t]he possibility that prospective jurors may have been answering questions in a manner they believed the trial court wanted to hear[, however,] identifies at most potential, rather than actual bias and is not a basis for reversing a judgment." (*People v. Vieira* (2005) 35 Cal.4th 264, 289.)

Here, defendant complains about the trial court's questioning of Juror No. 6, in particular the court's specific questioning after the juror stated the shooting was something that the victim did not deserve: "I don't think anybody would disagree with that. The question in this case, though, isn't whether he deserved this to happen to him. The question in the case is, number one, was a crime committed, and, number two, did [defendant] commit it and can the People prove that beyond a reasonable doubt? And, you know, the fact that you might have had, you know, some contact with the decedent really doesn't bear on any of those questions, does it?" Defendant complains that this statement demonstrates that the trial court refused to concede the juror should be excused for cause and "was an attempt to 'salvage' the juror"; further, defense counsel was required to waste valuable voir dire time on this juror, and the debate with this juror occurred in front of the other jurors and was a signal to them that any sign of bias would lead to a verbal battle with the trial court.

Defendant argues the effect of the trial court's questioning was apparent in the statement of Juror No. 1 (who was questioned after Juror No. 6) that in spite of what her questionnaire stated about her assault, she had to set aside her experience, "bottle it up" and "start fresh." Defendant further argues that such salvaging of a questionable juror was present in Juror No. 27, whose birth mother had been murdered; who told the court he would not be open minded because "[i]t seem[ed] like it would cloud [his] judgment," and to whom the court responded, "I mean the two situations are obviously unrelated." As proof of his theory, defendant points out Juror No. 27 later acquiesced that he could be impartial.

Our review of the record does not disclose that the trial court's questioning of any jurors was an attempt to "salvage" any problematic jurors or to prime the jury on how to respond to questions. Rather, the court's thorough questioning was intended, as the court stated, to break down and examine the basis of any potential bias in a juror. The trial court remains in the best position to determine whether a prospective juror possesses a latent bias that will harm deliberations, and to fashion questioning that will uncover such

23

bias.  (*People v. Rogers* (2009) 46 Cal.4th 1136, 1149.)  In addition, the court was not naively under the impression that jurors would be forthright about their biases; rather, the extensive questioning of jurors such as Juror Nos. 6, 27, and 31 indicates the court used a variety of hypotheticals to assess whether bias actually existed in any juror.  "[B]ias is seldom overt and admitted.  More often, it lies hidden beneath the surface."  As a result, trial judges must be willing to ask "'prospective jurors relevant questions which are substantially likely to reveal such juror bias or prejudice, whether consciously or unconsciously held.'"  (*People v. Taylor* (1992) 5 Cal.App.4th 1299, 1312–1313.)

Further, there is no indication that the trial court improperly used the struck jury method to influence the responses of jurors.  As noted above, the trial court is required to conduct voir dire in open court.  (Code Civ. Proc., § 223.)  Although Juror Nos. 1 and 31's responses to questions indicated they had been listening to the questioning of the other jurors, defendant can point to no prejudice from the trial court's use of an open court.  Instead, the jurors responses to questions indicated they had listened to the court's discussion of bias and the need to decide the case on the facts rather than their beliefs.  At most, the questions indicate the jurors were taking their duties seriously.

Finally, as the court's questioning indicates, it used various devices to uncover juror bias, such as the questionnaire, repeated and varied questioning, and hypotheticals, and that it evaluated each juror's response carefully.  Bias is the rodent that must be lured from its hiding place; it is not the family dog that easily runs to jump on your lap.  This record does not reflect an erroneous belief that jurors will answer truthfully about bias, but an understanding that bias must be flushed out.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED.

JOHNSON, J.

We concur:

MALLANO, P. J.

CHANEY, J.